



**Andrew Altschul,** OSB No. 980302
E-mail: andrew@baaslaw.com
**Kristine Lambert,** OSB No. 010684
E-mail: kristine@baaslaw.com
BUCHANAN, ANGELI, ALTSCHUL
& SULLIVAN LLP
321 SW Fourth Avenue, Suite 600
Portland, OR 97204
Telephone: 503.974.5015
Facsimile: 971.230.0337

Of Attorneys for Plaintiff

FILED'10 MAY 7 15:39 USDC-ORP

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

### PORTLAND DIVISION

**DENNIS RENO,**

Plaintiff,

v.

**CITY OF NEWPORT, an Oregon municipal corporation, WILLIAM D. BAIN, an individual, and JIM VOETBERG, an individual,**

Defendants.

CV'10 - 536 KI

Civil No. _____

**COMPLAINT**

(42 U.S.C. §1983; ORS 659A.203; ORS 659A.230; ORS 659A.199; Wrongful Termination in Violation of Public Policy; Breach of Contract)

DEMAND FOR A JURY TRIAL

## INTRODUCTION

1.    This is an action for declaratory, injunctive and monetary relief, including attorney's fees and costs, to redress unlawful employment practices to which Defendants subjected Plaintiff, in violation of Plaintiff's statutory, common law and contractual rights.

33294

Page 1 -    COMPLAINT

## JURISDICTION

2.      Jurisdiction is conferred upon this Court by 28 U.S.C. §1331, federal question jurisdiction, 28 U.S.C. §1343, 28 U.S.C. §2201, and 42 U.S.C. §1983.  This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. 1367.

3.      Venue is proper in the District of Oregon pursuant to 28 U.S.C. §1391(b) because the claims arose in this judicial district.

## PARTIES

4.      Plaintiff Dennis Reno ("Plaintiff" or "Reno") is currently a resident of Newport, Oregon.  During the relevant period, Plaintiff was an employee of Defendant City of Newport and worked in Newport, Oregon.

5.      Defendant City of Newport ("Newport" or the "City") is a municipal corporation licensed by the state of Oregon.  City officials acting in their official capacity were, at all relevant times, acting under color of state law.

6.      Defendant William D. Bain ("Bain") is an individual who resides in Newport, Oregon.  Bain is and was, at all relevant times, Mayor of the City of Newport.

7.      Defendant Jim Voetberg ("Voetberg") is an individual who resides in Newport, Oregon.  Voetberg served as City Manager for the City of Newport beginning in mid-2009 and continuing.

## GENERAL ALLEGATIONS

8.      Plaintiff held the position of Airport Manager at the time of his termination in November of 2009.

9.      Plaintiff worked under an Employment Contract ("Employment Contract") entered into between himself and the City of Newport on February 5, 2008. This Agreement provided that "Dennis Reno shall continue employment as Airport Director until this agreement is terminated or until Dennis Reno retires."  The contract allowed for termination

for cause under specified conditions or termination without cause under alternative conditions.

10.     During his eight-year employment with the City, Plaintiff was charged with the development of an airport facility that could attract a regional airline to serve the City's residents and attract new business to the area.

11.     Plaintiff worked with the Federal Aviation Administration ("FAA"), the Oregon Department of Transportation ("ODOT"), the Oregon Department of Aviation ("ODA") and various other state and federal agencies to ensure the airport was in compliance with state and federal mandates.

12.     Plaintiff also worked diligently to secure millions of dollars in state, federal and county grant money to support the development and retention of a regional airline.

13.     In total, Plaintiff secured approximately $12 million dollars in grant money to improve the airport to get it ready for airport service.  He then secured additional grants totaling $4.5 million to support regional air service and provide revenue guarantees necessary to attract an airline to the area.  These grants included $842,000 in federal funds and $3.6 million in state money.

14.     Because of his contributions, Plaintiff was told in February of 2008, as part of his most recent performance review, that he was "a significant asset to the City."  This review, like all others before it, confirmed that Plaintiff consistently performed excellent work on behalf of the City and the airport.

15.     When, in mid-2008, the City was finally ready to select an airline to serve its citizens, Plaintiff worked with then-City Attorney Gary Firestone ("Firestone") to craft a selection process that was open and fair, and which would attract a sizeable airline.

16.     Plaintiff, on behalf of the City, sent out a Request for Proposal ("RFP") to several regional airlines so they could compete for the ability to serve the City.  The City also published its request in appropriate trade journals.  Additionally, because of their explicit,

prior interest in being selected, several airlines were specifically asked to participate in the RFP, including SeaPort Airlines ("SeaPort") and Cape Air.

17.     Cape Air, based in Massachusetts, responded to the RFP and offered a comprehensive, fairly priced package of services that contained an inter-line agreement and a baggage transfer provision, both previously determined to be important provisions for customers and for long term sustainability.  The inter-line agreement allowed Cape Air flights to be ticketed and arranged in combination with connecting airline flights, as part of a package or by a ticketing agency such as Expedia or Travelocity.  The baggage transfer provision provided for automatic baggage transfer onto connecting flights.

18.     Plaintiff, along with City officials, including Mayor Bain and then-City Manager Allen O'Neal ("O'Neal"), were pleased with the Cape Air proposal and planned to request City Council approval to move forward.

19.     Almost immediately thereafter, however, Plaintiff discovered that state officials in Oregon wanted the bid process rescinded because SeaPort, an Oregon-based airline, had failed to participate.

20.     Plaintiff, who had expended significant personal effort and capital to encourage numerous airlines to compete in the original RFP process, assured state officials that SeaPort, and its then-CEO, Kent Craford ("Craford"), had been given an invitation to participate in the RFP and had simply failed to respond.

21.     Plaintiff, therefore, resisted any effort to overturn the fair process that had resulted in a good outcome for the City.

22.     After relentless, aggressive lobbying, Bain capitulated to the incessant pressure from state officials and suggested to Plaintiff that it was in everyone's "best interest" to send out a second RFP.

23.     To do so without violating ODOT requirements, the City had to claim that a material change occurred in the project and send out a second RFP.

24.     There was no real "material change" other than pressure from lobbying forces, and Plaintiff was uncomfortable with the obviously untrue representation.

25.     Bain advised Plaintiff to "keep his mouth shut" and let the process unfold.

26.     In private conversations with Bain, O'Neal and Firestone, Plaintiff expressed numerous concerns about the RFP process and the legality of the City's actions.

27.     Plaintiff also expressed his concerns to other individuals including Ron Larson, then-Airport Manager in Astoria, Mark Fixel, the consultant who assisted with the ConnectOregon grant, Charles Reardon, the consultant who assisted with the federal air 22 grant, City Recorder Peggy Hawker, and other members of the City's Airport Committee.

28.     Bain and other City officials were dismissive of Plaintiff's concerns and directed everyone to move forward with the second RFP.

29.     SeaPort responded to the second RFP, offering service under terms that were significantly less favorable to the City than the Cape Air proposal.

30.     SeaPort did not have an existing inter-line agreement, so its flights could not be booked in combination with longer flights out of hub airports like Portland or Seattle. SeaPort also did not offer automatic baggage transfer, meaning passengers flying to a city in hopes of connecting on to another destination would have to pick up their luggage, re-check in for the next trip segment, and go through security before they could continue on their trip.

31.     Most significantly, the SeaPort proposal was more expensive -- costing taxpayers almost double per passenger over the Cape Air proposal.

32.     Plaintiff was extremely disappointed in the proposal from SeaPort.  Plaintiff believed the increased costs, as well as the inter-line and baggage service concessions, were too significant to allow the contract to be awarded to SeaPort, even if it was an Oregon company.

33.     Plaintiff discussed these concerns directly with Bain and other City officials involved in the decision-making process.

34.     Like his concerns with the misrepresentation regarding the bid process, City officials refused to acknowledge the significance of the issues Plaintiff raised.

35.     Bain advised Plaintiff to support SeaPort or stay quiet.

36.     Bain was patently annoyed by Plaintiff's continued involvement with the airline selection process, but could not force Plaintiff out because he was central to the airport project. Bain, however, directed Plaintiff to keep his opinions to himself in public forums and City Council meetings.

37.     Plaintiff tried to abide by that directive, but felt strongly about the significant increased costs for taxpayers under the SeaPort proposal as well as the lost benefits to travelers under the proposed contract.

38.     Plaintiff was concerned about the airport's ability to sustain and provide the best possible service to the citizens of Newport and the region under the SeaPort contract.

39.     Plaintiff raised his concerns with numerous individuals including O'Neal, City Councilor Patricia Patrick, City Councilor Jeff Bertuleit, Steve Schuster, local businessman, Walter Sherman, local commercial pilot, City Recorder Peggy Hawker and Ron Larson, then-Astoria Airport Manger.

40.     Because of the timing of the second RFP, Cape Air was no longer able to comply with the grant requirements.

41.     At a vote on November 12, 2008, SeaPort was selected to provide airline service and given a short window of time to finalize the $4.5 million dollar contract for air services.

42.     Daniel Clem ("Clem"), then Executive Director of the Oregon Department of Aviation, was instrumental in ensuring SeaPort's acceptance over Cape Air and actively lobbied for SeaPort, going so far as to participate in meetings to decide which airline would win the RFP.

43.     Because of Plaintiff's position as Airport Manager, he would have been a critical player in the contract review and negotiations with SeaPort.

44.     City officials did not want Plaintiff involved in the negotiations, nor did they want him pointing out the significant concessions the City gave to SeaPort and the huge cost increase associated with SeaPort's selection.  As a result, Bain, along with City Manager O'Neal, simply decided to terminate Plaintiff's contract of employment.

45.     On November 14, 2008, the City provided Plaintiff with notice that his services were no longer needed.

46.     Prominent community members and businessmen throughout the region actively supported Plaintiff, asking the City to reinstate him due to his excellent performance and hard work on behalf of the airport.  Several noted that one of his great strengths was that he was a businessman and not a politician.

47.     City Manager O'Neal, in response to that support and in an attempt to seal Plaintiff's fate and ostracize him from the community, sent out press releases detailing allegations he claimed were the reason behind the City's actions.  In these, he claimed that Plaintiff was terminated for obtaining health insurance benefits for his common-law wife and for lying on his resume.

48.     Plaintiff, as was his right, requested a hearing and appealed the termination decision.

49.     While Plaintiff was awaiting the hearing, the City spent $85,000 on Roger Morse Investigative Services ("Morse"), allegedly to evaluate the evidence against Plaintiff.

50.     Morse, instead of reviewing the facts surrounding Plaintiff's termination, actively engaged in fact finding designed to discover new evidence to justify the City's action.  Morse interrogated numerous individuals about any improper actions Plaintiff might have engaged in during his employment.  Morse also culled through myriads of documents in an effort to discover problems that could be used to support the City's action.

51.     In the end, Morse tried to pin several additional claims levied by City officials on Plaintiff, including allegations that he stole gas, failed to properly pay for furniture in his office, improperly used his City-owned computer, and violated EPA laws regarding fueling airport vehicles.

52.     Despite Morse's aggressive tactics, each of these claims was determined to be without merit.

53.     Also during the time that Plaintiff was awaiting his hearing, Bain, in violation of City regulations, openly shared his negative opinions of Plaintiff in a newspaper editorial.

54.     After an almost five-month wait, and in spite of the City's effort and expense, when the evidence allegedly justifying Plaintiff's termination was presented, Plaintiff was reinstated to his position as Airport Manager.  The evidence demonstrated that the City had no cause to terminate his employment, and that the allegations were exaggerated, falsified or did not justify a termination decision.

55.     City officials, however, made sure that the investigative and appeal process took sufficient time to ensure that the contract with SeaPort was finalized before Plaintiff's appeal was resolved so that Plaintiff, even if reinstated, could not derail their efforts to support SeaPort.

56.     Plaintiff was reinstated on March 13, 2009, the day before SeaPort started service, and after the contract was finalized.

57.     When Plaintiff resumed his duties and reviewed the SeaPort contract, he realized it was shockingly one-sided and oppressive.  He was astonished at the City's concessions and the total waste of government money.

58.     At the time of his return, the City and Plaintiff signed an Agreement between the City of Newport and Dennis Reno and Amendment to Existing Employment Contract ("Agreement and Amendment").  The Agreement and Amendment included, in paragraph 4, that "no City Employee or elected official may retaliate against Reno for his assertions that

the City inappropriately handled his discipline and the investigation that led to it. Reno and the City understand that the obligation to refrain from engaging in retaliation shall be broadly construed. It includes any on or off-duty conduct, whether related to employment or not, that could discourage an employee or other person from making a complaint or participating in an investigation."

59.     Plaintiff was not allowed to simply return to his position without consequence. Bain and other City officials, in retaliation for Plaintiff's refusal to capitulate to mayoral pressure on the RFP process, because of his efforts to stand up against City waste of taxpayer resources, and because of his costly and public challenge to the City's improper attempt to terminate his contract of employment, began a campaign to harass and retaliate against Plaintiff.

60.     Plaintiff discovered, upon his return, that 2.5 of his 5 employees had been cut from his budget. Plaintiff was expected to handle their jobs in addition to his own.

61.     Plaintiff also was advised that his airport operations and maintenance budget had been cut by 40%.

62.     Plaintiff, in response to this maneuver from City officials, went directly to the City Council's Budget Committee to request reinstatement of the full-time employee positions and funds.

63.     The budget committee unanimously voted to put two positions back into the airport budget and provide necessary funding; however, Bain and then-Interim City Manager Dale Shaddox, who retained final discretion over spending and hiring decisions, refused to actually allow Plaintiff to access the approved money or personnel.

64.     As a result, Plaintiff was forced to work three jobs to complete airport-required tasks.

65.     The City further exacerbated Plaintiff's heavy workload by refusing without justification his requests to take vacation time.

66.     Prior to the City's attempted termination in November 2008, no one had reviewed his requests for vacation, much less denied them.

67.     Despite all the additional work and frustration, Plaintiff was excited about the new regional airline service and wanted to be a part of creating a great airport for the citizens of Newport.  He was determined not to be forced out, and simply worked longer hours and weekend days to accomplish the tasks that needed to be done.

68.     During this time, Bain reluctantly appointed Plaintiff to serve on the Coastal Air Service Consortium ("Consortium"), a move he was forced to make due to Plaintiff's position and the fact that his name was on every grant application related to the airport.

69.     The Consortium had been created during Plaintiff's absence to provide oversight to the SeaPort contract and manage the revenue guarantee SeaPort received to continue its service.

70.     Bain had appointed himself as chair of the Consortium.  He also appointed Clem and two officials from Astoria to participate on the Consortium.

71.     Clem became highly involved in the Consortium, essentially directing how most of the funds were paid out and working in close connection with Bain and Craford to decide how to spend the $4.5 million dollars in grant money.

72.     The Consortium spent up to $50,000 each week on expenses.  Because of the individuals selected and size of the group, Bain and Clem retained strong control in dictating how grant monies were to be allocated.

73.     On July 1, 2009, a new City Manager, Voetberg, was appointed.

74.     Plaintiff hoped a new manager would bring an end to the retaliatory treatment, instead, Voetberg, who spent several weeks working with Bain and former City Manager Shaddox upon his arrival, quickly picked up their bias against Plaintiff.

75.     As a result, during one of Voetberg's first visits to the airport, he threatened Plaintiff with termination if he did not get in line and cease his outspoken behaviors.  He

specifically informed Plaintiff: "Something is wrong here, I'm going to find it, and you need to be looking for a job. Your swaggering is going to come to a stop. You think you won, but you didn't."

76.     Voetberg also told Plaintiff that he would "build a file" against Plaintiff if necessary to get rid of him.

77.     To that end, one of Voetberg's first acts was to require Plaintiff to submit a complete business plan for the airport within 60 days.

78.     To create the plan, Plaintiff requested access to the records he maintained before his termination in November 2008, all of which had been taken from him during the City's investigation. These computer records contained all the important data on the airport operations.

79.     Plaintiff was told, however, that the City "accidentally" destroyed all of his documents during its aggressive computer searches of Plaintiff's computers, as part of their unsuccessful attempts to justify their November 2008 termination decision.

80.     Plaintiff was forced to spend hundreds of additional hours to re-create documents critical to airport operations, and was forced to work almost around the clock to finish it on time. When done, the business plan sat unread on Voetberg's desk for approximately three months. The plan had no relevance, worth, or purpose other than to harass and overwhelm Plaintiff.

81.     Voetberg further harassed Plaintiff by adding a whole litany of new responsibilities to Plaintiff's already overbooked schedule, such as implementing new procedures for pricing fuel and requiring numerous reports on airport operations.

82.     Voetberg also required Plaintiff to develop contracts for the engineering company, enterprise car rental and the firing range rather than use the City Attorney.

83.     Voetberg sometimes visited the airport once or twice a week to request reports and dig around about potential problems or ask about operations.

84.    Plaintiff, despite this treatment, continued to work hard and focus on the airport.

85.    During July and August of 2009, Plaintiff spoke with Voetberg numerous times about the Federal Aviation Administration's ("FAA") revenue diversion requirements.

86.    Plaintiff had worked diligently to secure Part 139 certification for the Newport airport, a certification required in order to offer scheduled air carrier service. As a condition of the FAA's grant of Part 139 status to an airport, the airport was required to abide by certain directives. One of the directives was that the City collect rent at fair market value for any non-airport use of the airport property. City police were using part of the airport land for a firing range; as a result, the FAA required a contractual agreement assessing a fair rent to the police.

87.    Voetberg presented Plaintiff with an agreement regarding police use drafted by City Attorney Penelope McCarthy ("McCarthy"), but Plaintiff explained that the agreement as presented did not comply with applicable FAA regulations. Plaintiff also explained that FAA regulations required that the FAA approve any agreements regarding the revenue diversion requirements.

88.    Thereafter, Plaintiff refused on several occasions to sign the police use agreement, stating that it appeared to violate FAA regulations and required FAA review and approval.

89.    On August 18, 2009, Voetberg, in an email directed Plaintiff, demanded that Plaintiff immediately sign the police use agreement drafted by McCarthy. Voetberg stated that McCarthy had reviewed the agreement with the FAA and secured necessary approvals. Plaintiff had trouble believing it had been approved, as it contained provisions violating the FAA directives, but he could not dispute Voetberg's statement.

90.    Plaintiff was fully aware that it could cost taxpayers additional money and the City would blame him if the FAA imposed a fine for a violation relating to the land use

requirements, or if the City lost its Part 139 status because of the unlawful contract, but knowing his job was on the line, with great hesitancy, Plaintiff signed the agreement.

91.    A couple of months later, on October 2, 2009, Plaintiff learned from the FAA that the contract he signed had not been reviewed or approved.

92.    Plaintiff went immediately to McCarthy to ask for assistance in resolving the issue and to report Voetberg's unlawful directive.

93.    Also around this same time, Voetberg, Bain, Clem and Craford had become outwardly angry with Plaintiff about his criticisms of SeaPort during Consortium meetings.

94.    Beginning in the early summer of 2009, it became clear that SeaPort would likely breach their contract with the City because it had not provided evidence that it could secure either the inter-line or baggage transfer agreements as required.

95.    Plaintiff believed the City should use SeaPort's contractual breaches as an opportunity to back out of the restrictive, one-sided contract and renegotiate for more favorable terms.

96.    Plaintiff was particularly concerned about the excessive costs associated with SeaPort, which far exceeded even the original grant request for revenue assurances.

97.    SeaPort required a subsidy of $928 per traveler while Cape Air would have cost a subsidy of $589 per traveler.

98.    Clem and Bain were annoyed by Plaintiff's discussions of breach and contract negotiations, but Plaintiff continued to raise concerns throughout the summer, talking in depth about how oppressive, costly and unfair the contract was to the City.

99.    Plaintiff reported his concerns and disclosed the pending contract breach to several individuals, including Voetberg, City Councilor Patricia Patrick, City Councilor Jeff Bertuleit, City Councilor Terry Obteshka, Steve Schuster, local businessman, Walter Sherman, local commercial pilot and reporter for Depot Bay Beacon, City Recorder Peggy Hawker and Ron Larson.

100.    When, in early fall, SeaPort was officially in breach, having failed, without excuse, to implement both the inter-line agreement and the baggage transfer agreement, which Plaintiff believed were critical to long term sustainability, Plaintiff was the sole vote against giving SeaPort further extensions to get in compliance.

101.    Bain and Clem garnered a majority and outvoted Plaintiff, but were increasingly frustrated with Plaintiff for voting against SeaPort and identifying the problems with the SeaPort contract.

102.    After the September 11, 2009 Consortium meeting to discuss SeaPort's breach, Voetberg, acting under direction of Bain and Clem, told Plaintiff that he should resign from the Consortium immediately.

103.    Plaintiff resisted and informed Voetberg that he believed he was acting in the best interest of the City and working to save taxpayer money and resources.

104.    Voetberg did not give up and regularly threatened Plaintiff, stating it "would be bad" for Plaintiff if he failed to voluntarily quit the Consortium.

105.    Plaintiff, nevertheless, refused to quit the Consortium.

106.    Plaintiff reported the threats from Voetberg to City Recorder Peggy Hawker and City Attorney McCarthy.

107.    Craford also became involved in efforts to force Plaintiff off the Consortium. Even prior to the vote on the contract extension, Craford told Bain and Clem that Plaintiff should be eliminated from the Consortium due to his resistance to the terms of the one-sided contract.

108.    Craford told a Newport newspaper reporter, on September 13, 2009, that SeaPort would "finish" the project "with or without" Plaintiff.   Craford also told the reporter that Plaintiff was being investigated for an ethics violation that he believed would result in jail time.

109.    The reporter, upon hearing from Craford, called Plaintiff to discuss Craford's statement and get a quote for the paper from Plaintiff.  Plaintiff said he believed Craford made these statements in response to his votes on the Consortium, but Plaintiff reiterated his position that this was an appropriate time to adjust the contract with SeaPort.  He further advised the reporter that he was not aware of any ethics charges or complaints.

110.    Plaintiff reported Craford's statement and threat immediately to McCarthy, but she failed to respond.

111.    However, after reporting the threat, Plaintiff discovered that, at Craford's insistence, McCarthy was actively investigating those alleged and false ethical problems.

112.    Craford then personally threatened Plaintiff directly, claiming he would accuse Plaintiff of ethical violations related to the RFP if he continued to vote against his airline.

113.    Plaintiff, who had not engaged in any improper or unethical behavior, was upset at being threatened in this manner.

114.    Plaintiff reported this threat to City Recorder Peggy Hawker, City Councilor Patricia Patrick, City Council Jeff Bertuleit and City Councilor Richard Kilbride.

115.    Immediately before the October Consortium meeting, on October 9, 2009, Voetberg called Plaintiff to again pressure Plaintiff into resigning from the Consortium. During the conversation, Voetberg threatened that he could find "something" improper related to the airport operations if Plaintiff refused to resign.

116.    Plaintiff again refused to resign as demanded.

117.    Around this time, Plaintiff discovered that the Consortium had not been properly established under Oregon statutes.

118.    Oregon law, ORS 190.010 et. seq., dictated how the Consortium should have been established.  Under the applicable statutes, the City Council should have governed and been responsible for Consortium activities.

119.    Plaintiff reported to McCarthy, who had not been City Attorney at the time of the Consortium's formation, that the Consortium was formed illegally.

120.    He disclosed to McCarthy that without proper formation, the votes were not valid.  In support of his statements, Plaintiff provided McCarthy with copies of ORS 190.010 describing the authority of local governments to make intergovernmental agreements.

121.    In response to Plaintiff's concerns, McCarthy asked only "does anyone else know?"  She then stated she would "clean up" the Consortium problem and for Plaintiff to keep his discovery confidential.

122.    McCarthy then engaged in a cover-up of the problem, trying to push through legislation designed to retroactively remedy the problem without ever fully informing the City Council of the issue.

123.    Plaintiff became upset by the cover-up and reported to David Allen, local businessman and chairmen of the City Budget Committee, City Recorder Peggy Hawker, Walter Sherman, local pilot and reporter for the Depot Bay Beacon, City Councilor Patricia Patrick and City Councilor Jeff Betuleit that the Consortium, which was spending up to $50,000 a week of grant money, failed to have the proper oversight as required by Oregon state law.

124.    On October 14, 2009, the Depot Bay Beacon reported that Bain became visibly upset when confronted about the Consortium's illegal formation and a possible cover-up of the problem.

125.    Plaintiff thereafter had a meeting with McCarthy regarding Voetberg's retaliatory conduct, the harassment he endured at the hands of Voetberg, and the campaign to force Plaintiff out.   Plaintiff described Voetberg's threats and his persistent efforts to overwork and overwhelm him.

126.    McCarthy took no action in response to Plaintiff's complaints.

127.    A short time later, Voetberg called Plaintiff and McCarthy into his office to discuss what he perceived as Plaintiff's inappropriate attitude.  During the course of the discussion, Plaintiff exclaimed to McCarthy:  "This is exactly the type of behavior I've been talking to you about."

128.    Upon hearing that McCarthy and Plaintiff had prior confidential conversations about Voetberg's conduct, Voetberg went ballistic.

129.    He questioned McCarthy about having conversations behind his back; she responded by stating that Plaintiff had approached her with a list of concerns, but that their conversations were confidential.  Voetberg demanded to see the list, and when he did not get it, he angrily departed.

130.    Almost immediately thereafter, on October 28, 2009, without warning, the City advised Plaintiff that they were terminating his contract of employment under the provision allowing for termination without cause.

131.    They provided no justification for this action.

132.    Usually, to effect a termination, the City Council would have to meet and vote on the course of conduct.  In this instance, Bain refused to allow an executive committee meeting to discuss the termination of Plaintiff's employment because the press would have been able to report on the decision and the decision-making factors.

133.    Bain and Voetberg therefore conspired to terminate Plaintiff without allowing debate or discussion.  To do so, they had to review the legal requirements and knowingly formulated a plan to avoid compliance with the City's regulations.

134.    Ultimately, Voetberg met with City Council members in pairs rather than in executive session.  They provided the individuals with the information they believed justified the decision to terminate and convinced the City Council members to ratify their decision to terminate Plaintiff's contract.

135.    Voetberg had the authority to terminate and exercised his right after conducting the meetings, exercising the right to terminate Plaintiff without cause on October 30, 2009.

136.    Without a quorum, there was no official meeting, no press and no transparency to the City's actions.

137.    The City, however, offered to make a secret deal with Plaintiff by offering to enter into a confidential settlement agreement if Plaintiff promised not to sue.

138.    Plaintiff declined the City's confidential settlement offer, and made clear to McCarthy that he would seek legal advice regarding the violation of his legal rights.

139.    Immediately thereafter, City officials, led by Bain and Voetberg, scoured through his airport hanger lease to search for evidence of breach or a way to force him out of the airport. While they were not successful on those fronts, they did send him an invoice for $500.00, claiming he owed money for airport improvements allegedly occurring years prior. In taking this action, the City singled him out for charges designed to be passed along to everyone, if at all.

140.    Also in November 2009, the City, led by Bain and Voetberg, denied Plaintiff the right to use his hanger as collateral for a loan, a right routinely provided to all citizens of the City of Newport. The contract proposed by the bank had been approved for use in other situations, and had even been approved for a 2008 loan taken out by Plaintiff, before his stand against the City's unlawful conduct, but now was – without justification – denied.

141.    The City has never denied the right to use an individual's hanger as collateral or otherwise interfered with their loan application.

142.    At all relevant times, Defendants Bain and Voetberg were acting under color of law and under color of authority as City officials and agents or servants of the City of Newport.

143.    As a direct and proximate result of the actions of Defendants, Plaintiff suffered the following injuries and damages:

      a.  Violation of his free speech rights under the First Amendment of the United States Constitution;

      b.  Adverse employment action consisting of administrative leave;

      c.  Adverse employment action consisting of an aggressive and invasive investigation into his personal life;

      d.  Injury to his reputation;

      e.  Emotional distress due to harassment, threats and retaliation;

      f.  Adverse employment action consisting of termination of his employment and the associated loss of wages and benefits;

      g.  Financial hardships and set backs due to increased rent on his airport hanger space and refusal to allow his hanger as collateral;

      h.  Loss of future wages, salary increases and benefits he would have enjoyed but for the retaliatory and unlawful actions.

144.    Plaintiff offered Defendants the opportunity to avoid litigation and see if this matter could be resolved via mediation, but Defendants declined the offer.

## FIRST CLAIM FOR RELIEF
### 42 U.S.C. §1983
### Against Newport

145.    Plaintiff incorporates by reference the allegations of paragraphs 8 through 144.

146.    Plaintiff engaged in protected speech when he, as a citizen of Newport, spoke out about matters of public concern and reported:

      a.  To members of the press, various City officials including Bain, City Firestone and O'Neal, the airport manager in Astoria, and city officials from Astoria, the unlawful second Request for Bid process and the

violation of Oregon law and cost to taxpayers resulting from the second bid process;

b. To members of the press, various City officials including Bain, Firestone and O'Neal, the airport manager in Astoria, and city officials from Astoria, the increased costs and loss of benefits associated with the bid from SeaPort, and the possibility that the increased costs affected the long-term sustainability of the airport;

c. To Voetberg and McCarthy, that the City's proposed revenue diversion agreement violated applicable FAA regulations;

d. To members of the press, Bain, Voetberg, Clem, Craford, and citizens of Newport, that the City should take advantage of SeaPort's breach of contract to negotiate new terms that were more favorable and less costly to the City;

e. To members of the press and McCarthy, SeaPort and Craford's threats against Plaintiff designed to silence him and force him to stop efforts to report and resist the oppressive contract and gross waste of taxpayer money;

f. To McCarthy, Voetberg's threats to harass him and terminate his employment if he refused to resign from the Consortium and cease his efforts to resist the oppressive contract and gross waste of taxpayer money;

g. To McCarthy, members of the press and citizens of Newport, that the Consortium, which distributed $4.5 million in grant money, was formed in violation of Oregon law.

147.   Plaintiff's protected speech related to political, financial, and social concerns relevant to the citizens of the City of Newport because 1) Defendant was charged with

operating an airport and providing airport services for the financial and social benefit of the City; 2) the City's failure to operate a successful and fiscally sound airport has a direct impact on the citizens of the City; 3) Defendant's misuse of funds has a direct impact on the citizens of the City; and 4) the City's refusal to follow its own policies and procedures has a direct impact on the citizens of the City of Newport.

148.   Plaintiff's protected speech did not interfere with his work or work requirements nor did it cause Plaintiff to violate any work-related policies.

149.   Plaintiff's protected speech was a substantial or motivating factor in Defendant's decision to take adverse action against him.

150.   Defendants Bain and Voetberg authorized and approved adverse employment actions against Plaintiff so that they could silence Plaintiff's protected speech, and the City Council of Newport expressly approved the actions of Bain and Voetberg and ratified the decision to take adverse employment actions against Plaintiff because of his speech and reports of mismanagement, abuse of authority and financial waste.

151.   The City Council's ratification of the actions and decisions of Bain and Voetberg violated Plaintiff's First Amendment rights.

152.   The City Council, in addition to ratifying the unlawful actions of its officials, developed and maintained policies or customs exhibiting deliberate indifference to the constitutional rights of the citizens of Newport.

153.   It was the policy and/or custom of the City Council to fail to exercise reasonable care to oversee the actions of its city managers and mayor, to inadequately supervise and train its city managers and mayor and to, therefore, adequately discourage constitutional violations by its city mangers and mayor.  Examples of this policy or custom include:

        a.   Refusing to oversee the decisions of the mayor and city managers and exercise lawfully required oversight duties;

b. Refusing to exercise control over Bain and O'Neal's efforts to oust Plaintiff from his employment in November of 2008;

c. Refusing to allow debate on matters of public importance, but instead capitulating to Bain's efforts to manipulate the RFP process and SeaPort airline selection process;

d. Refusing to adequately supervise Bain and O'Neal in their efforts to publicly humiliate and vilify Plaintiff for his efforts to save taxpayer money and resources;

e. Refusing to adequately supervise Bain and Shaddox and require them to provide budgeted and approved resources, voted on by the City Council but withheld in punishment for Plaintiff's protected speech;

f. Meeting in small groups so as to avoid press review of their communications, which showed their willingness to avoid transparency and use the power of their position to accomplish unlawful objectives;

g. Refusing to adequately supervise Bain in the formation of the Consortium;

h. Allowing Bain, Voetberg and McCarthy to push through legislation to retroactively provide technical fixes to the illegal formation of the Consortium without consequence to Bain for failing to follow Oregon statutory requirements.

154. As a result of the above described policies and customs, city mangers and the Mayor of the City of Newport, including O'Neal, Voetberg and Bain, believed that their actions would not be properly monitored by the City Council and that misconduct would not be investigated or sanctioned, but would be tolerated.

155.   The above described policies and customs demonstrate a deliberate indifference on the part of the City of Newport to the constitutional rights of the citizens of the City of Newport and were the cause of the violations of Plaintiff's rights.

156.   Defendant retaliated against Plaintiff because of his protected speech by placing him on administrative leave, initiating an investigation into Plaintiff, and by terminating his employment on two separate occasions because of his protected speech on matters of public concern.

157.   As a direct and proximate result of Defendant's actions as alleged herein, Plaintiff has suffered economic losses in the form of back pay, front pay, lost benefits, and out-of-pocket expenses, in an amount to be proven at trial, plus interest thereon at the statutory rate of 9%.

158.   As a direct and proximate result of Defendant's actions as alleged herein, Plaintiff has suffered noneconomic harm in the form of emotional and mental distress, degradation, embarrassment and humiliation, for which Plaintiff seeks compensation in the amount of $750,000.00.

159.   Plaintiff has hired legal counsel to prosecute his claims and is entitled to his reasonable attorney's fees and costs incurred, including expert witness fees, pursuant to 42 U.S.C. §1988.

## SECOND CLAIM FOR RELIEF
### 42 U.S.C. 1983
### Against Bain and Voetberg

160.   Plaintiff incorporates by reference the allegations of paragraphs 8 through 144.

161.   Bain and Voetberg, acting individually or in concert, based on the authority they possessed due to their positions with the City of Newport, used the color of law to intentionally deprive Plaintiff of his rights under the First Amendment to the United States Constitution.

162.    Bain engaged in actions designed to force Plaintiff out of the airport, and out of the bid process, contract negotiation process, and fund distribution process among other actions, and these actions were motivated in substantial part because of Plaintiff's protected speech.

163.    Bain further used his authority to terminate Plaintiff's employment in or around November of 2008 and initiate an aggressive and intrusive investigation into his life for the purpose of driving him from his position and the City.

164.    Voetberg engaged in actions designed to force Plaintiff to quit his position as airport manager, to make his work life impossible so that he would no longer engage in protected speech, to leave his position on the Consortium, and to force him to resign, among other actions, and these actions were motivated in substantial part because of Plaintiff's protected speech.

165.    When Plaintiff continued to exercise his right to engage in protected speech and speak out on matters of public concern to the citizens of Newport, Voetberg and Bain, acting individually or in concert, used their political power to terminate Plaintiff's employment with the City.

166.    Even after his termination, Voetberg and Bain, acting individually or in concert, acted to deprive Plaintiff of rights as a citizen of Newport and cause him to suffer financial harm by refusing to allow his hangar as collateral and falsifying charges owed the City.

167.    The actions of Bain and Voetberg, acting individually or in concert, were done with deliberate indifference to Plaintiff's constitutional rights and violated Plaintiff's First Amendment rights.

168.    As a direct and proximate result of Defendants' actions as alleged herein, Plaintiff has suffered economic losses in the form of back pay, front pay, lost benefits, and

out-of-pocket expenses, in an amount to be proven at trial, plus interest thereon at the statutory rate of 9%.

169.    As a direct and proximate result of Defendants' actions as alleged herein, Plaintiff has suffered noneconomic harm in the form of emotional and mental distress, degradation, embarrassment and humiliation, for which Plaintiff seeks compensation in the amount of $750,000.00.

170.    Plaintiff has hired legal counsel to prosecute his claims and is entitled to his reasonable attorney's fees and costs incurred, including expert witness fees, pursuant to 42 U.S.C. §1988.

**THIRD CLAIM FOR RELIEF**
**Whistleblowing in Violation of ORS 659A.203(b)(A) and (b)(B)**
**Against Newport**

171.    Plaintiff incorporates by reference the allegations of paragraphs 8 through 144.

172.    Plaintiff disclosed information that he reasonably and good faith believed was evidence of a violation of applicable statutory provisions, rules and regulations including ORS 190.003 *et. seq.* (requirements for formation of intergovernmental agencies), 14 C.F.R. Part 139 (FAA certification requirements) and ORS 279.015 (Public contracting code).

173.    Plaintiff disclosed information that he reasonably and in good faith believed demonstrated that Newport officials engaged in gross mismanagement of the airport RFP process, the airport selection process, and the process whereby City officials created the Consortium to manage and distribute airport grant funds.

174.    Plaintiff disclosed information that he reasonably and in good faith believed revealed Newport's gross waste of taxpayer monies and grant funds. Plaintiff complained about the one-sided contract that resulted in significant costs for taxpayers and lost benefits for travelers.

175.    Plaintiff disclosed information that he reasonably and in good faith believed demonstrated abuse of authority on the part of Newport officials involved in the selection of

an airline to serve the citizens of Newport, the requirements for maintaining and overseeing airport services to the citizens of Newport, the disregard of significant contract breaches by Seaport, and the payout of grant funds obtained for the airport.

176.    The statutory violations, mismanagement, gross waste of funds, and abuse of authority were serious acts of misconduct that could and did undermine the ability of the City to perform its mission and serve its citizens.

177.    Defendant discouraged, restrained, dissuaded, coerced and otherwise attempted to force Plaintiff to stop making his lawfully protected disclosures. Defendant's unlawful actions included:

    a.    Forcing Plaintiff to withhold his analysis of appropriate airline operations from the City Council and other City officials;

    b.    Terminating Plaintiff's contract of employment in or around November of 2008 because Plaintiff resisted the unlawful second RFP process and opposed the waste of taxpayer money;

    c.    Engaging in aggressive investigation of Plaintiff to attempt to justify a termination decision;

    d.    Upon his return to work after his appeal, being forced to perform his job along with the duties associated with three other unfilled positions;

    e.    Upon his return to work after his appeal, requiring Plaintiff to engage in a barrage of additional irrelevant, time consuming tasks;

    f.    Upon his return to work after his appeal, pressuring Plaintiff to drop his complaints about mismanagement of government funds and resources;

    g.    Upon his return to work after his appeal, threatening Plaintiff with investigation of every aspect of airport operations until problems were discovered unless he stopped reporting unlawful City actions and resigned from the Consortium;

h.    Upon his return to work after his appeal, tricking Plaintiff into signing an airport-related contract that violated applicable FAA regulations and put the airport's status at risk; and

i.    Terminating his employment contract with the City to force Plaintiff off the Consortium and out of City operations.

178.    Defendant subjected Plaintiff to retaliation and adverse employment actions that were substantially motivated by Plaintiff's lawful reports under ORS 659A.203.

179.    Defendant subjected Plaintiff to additional harassment and retaliation after Plaintiff's termination when City officials used their official positions to cause additional damage to Plaintiff in retaliation for Plaintiff's lawful reports under ORS 659A.203.   These additional actions include false and vindictive financial charges directed to Plaintiff for his hanger lease at the Newport airport and refusal to allow Plaintiff to use his hanger as collateral for a bank loan even though other citizens, including Plaintiff prior to his reports of unlawful conduct, were able to use their hangers as collateral.

180.    Defendant's actions were intentional and constituted unlawful discrimination in violation of ORS 659A.203.

181.    As a direct and proximate result of Defendant's actions as alleged herein, Plaintiff is entitled to injunctive relief, including reinstatement.

182.    As a direct and proximate result of Defendant's actions as alleged herein, Plaintiff has suffered economic losses in the form of back pay, front pay, lost benefits, and out-of-pocket expenses, in an amount to be proven at trial, plus interest thereon at the statutory rate of 9%.

183.    As a direct and proximate result of Defendant's actions as alleged herein, Plaintiff has suffered noneconomic harm in the form of emotional and mental distress, degradation, embarrassment and humiliation, for which Plaintiff seeks compensation in the amount of $750,000.00.

184.    Plaintiff has hired legal counsel to prosecute his claims and is entitled to his reasonable attorney's fees and costs incurred, including expert witness fees, pursuant to ORS 659A.885 and ORS 20.107.

### FOURTH CLAIM FOR RELIEF
### Whistleblowing in Violation of ORS 659A.230
### Against Newport

185.    Plaintiff incorporates by reference the allegations of paragraphs 8 through 144.

186.    Plaintiff exercised his right to invoke or participate in a civil or administrative proceeding against Newport when he invoked his right to appeal Newport's decision to terminate his contract of employment.

187.    In exercising his lawful right to invoke or participate in a civil proceeding, Plaintiff invoked the protections of ORS 659A.230.

188.    Defendant subjected Plaintiff to adverse employment actions that were substantially motivated by Plaintiff's invocation of his lawful right to invoke or participate in a civil proceeding.

189.    As a direct and proximate result of Defendant's actions as alleged herein, Plaintiff is entitled to injunctive relief, including reinstatement.

190.    As a direct and proximate result of Defendant's actions as alleged herein, Plaintiff has suffered economic losses in the form of back pay, front pay, lost benefits, and out-of-pocket expenses, in an amount to be proven at trial, plus interest thereon at the statutory rate of 9%.

191.    As a direct and proximate result of Defendant's actions as alleged herein, Plaintiff has suffered noneconomic harm in the form of emotional and mental distress, degradation, embarrassment and humiliation, for which Plaintiff seeks compensation in the amount of $750,000.00.

192.    Plaintiff has hired legal counsel to prosecute his claims and is entitled to his reasonable attorney's fees and costs incurred, including expert witness fees, pursuant to ORS 659A.885 and ORS 20.107.

### FIFTH CLAIM FOR RELIEF
### Whistleblowing in Violation of ORS 659A.199
### Against Newport

193.    Plaintiff incorporates by reference the allegations of paragraphs 8 through 144.

194.    Plaintiff reported and resisted the unlawful formation of the Consortium, created in violation of ORS 190.003 *et. seq.*

195.    Plaintiff, in good faith, reported and resisted Defendant's requirement that Plaintiff sign an airport related contract that violated FAA regulations, 14 C.F.R. Part 139, and put the airport's status with the FAA at risk.

196.    Plaintiff, in good faith, reported and resisted violations of ODOT's RFP process requirements, ORS 279.015.

197.    As a direct result of Plaintiff's opposition to Newport's unlawful activities, Newport officials retaliated against Plaintiff by terminating Plaintiff's contract of employment with the City thereby causing him to suffer damage.

198.    As a direct and proximate result of Defendant's actions as alleged herein, Plaintiff is entitled to injunctive relief, including reinstatement.

199.    As a direct and proximate result of Defendant's actions as alleged herein, Plaintiff has suffered economic losses in the form of back pay, front pay, lost benefits, and out-of-pocket expenses, in an amount to be proven at trial, plus interest thereon at the statutory rate of 9%.

200.    As a direct and proximate result of Defendant's actions as alleged herein, Plaintiff has suffered noneconomic harm in the form of emotional and mental distress, degradation, embarrassment and humiliation, for which Plaintiff seeks compensation in the amount of $750,000.00.

201.    Plaintiff has hired legal counsel to prosecute his claims and is entitled to his reasonable attorney's fees and costs incurred, including expert witness fees, pursuant to ORS 659A.885 and ORS 20.107.

### SIXTH CLAIM FOR RELIEF
### Wrongful Termination in Violation of Public Policy
### Against Newport

202.    Plaintiff incorporates by reference the allegations of paragraphs 8 through 144.

203.    Plaintiff expressed his concern about what he believed in good faith to be illegal City management practices, abuse of authority, gross waste of taxpayer money, violation of state and federal statutes, rules and regulation, and retaliation against himself for exercising his lawful right to appeal the City's termination decision.

204.    Defendant's unlawful practices directly affect the health and welfare of the citizens of this state.

205.    At all material times, it was the public policy of the State of Oregon and the United States to: 1) prohibit an employer from retaliating against or discharging an employee who reports their illegal management practices; 2) prohibit an employer from retaliating against or discharging an employee who reports abuse of authority; 3) prohibit an employer from retaliating against or discharging an employee who reports gross waste of taxpayer money; 4) prohibit an employer from retaliating against or discharging an employee who reported violations of state and federal statutes, rules and regulations; and 5) prohibit an employer from retaliating against or discharging an employee for exercising his lawful right to appeal a termination decision.

206.    These public policies are embodied in various statutes including but not limited to ORS 659A.203, ORS 659A.230, ORS 659A.199.

207.    Plaintiff was retaliated against and terminated, in substantial part by his pursuit of rights related to his role as an employee, for resisting what he reasonably and in

good faith believed to be violations of the laws and public policy of the State of Oregon and the United States.

208.    As a direct and proximate result of defendants' actions as alleged herein, plaintiff has suffered economic losses in the form of back pay, front pay, lost benefits, and out-of-pocket expenses, in an amount to be proven at trial, plus interest thereon at the statutory rate of 9%.

209.    As a direct and proximate result of Defendant's actions as alleged herein, Plaintiff has suffered noneconomic harm in the form of emotional and mental distress, degradation, embarrassment and humiliation, for which Plaintiff seeks compensation in the amount of $750,000.00.

## SEVENTH CLAIM FOR RELIEF
### Breach of Contract / Retaliation
### Against Newport

210.    Plaintiff incorporates by reference the allegations of paragraphs 8 through 144.

211.    Defendant entered into an Employment Contract with Plaintiff under which Plaintiff would be entitled to employment until retirement absent a decision to terminate the contract.

212.    At the time of the City reinstated Plaintiff's employment, the City and Plaintiff entered into an Agreement and Amendment to the Employment Contract which included a provision that City employees and elected officials would not retaliate against Plaintiff for his assertions that the City inappropriately handled his discipline and the investigation that led to the discipline.

213.    The anti-retaliation provision was intended to be "broadly construed" as set forth in paragraph 4.

214.    City employees and elected officials breached the Agreement and Amendment by terminating the Employment Contract, at least in part because of his assertions that the

City inappropriately handled his discipline and the investigation and because he filed an appeal of the City's November 2008 decision to terminate his employment.

215.    Defendant's conduct violated paragraph 4 of the Agreement and Amendment.

216.    As a result of Defendant's breach, Plaintiff has suffered damages including lost income, lost future income, loss of reputation and lost benefits.  Plaintiff also suffered damage by agreeing to decreased compensation and payments of amounts alleged to be due as consideration for good faith execution of the Employment Contract and Amendment and Agreement.

217.    Plaintiff therefore requests damages equivalent to his lost income, lost future income, and lost benefits, together with interest at the legal rate from the date he sustained those damages.

218.    Plaintiff requests a refund of the 10% decrease in compensation he was subjected to under the terms of the Agreement and Amendment.

219.    Plaintiff requests a refund of all compensation he agreed to pay the City as insurance payments under the terms of the Agreement and Amendment and forgiveness of any remaining amounts due.

### EIGHTH CLAIM FOR RELIEF
**Breach of Contract / Duty of Good Faith and Fair Dealing**
**Against Newport**

220.    Plaintiff incorporates by reference the allegations of paragraphs 8 through 144.

221.    Defendant entered into an Employment Contract with Plaintiff under which Plaintiff would be entitled to employment until retirement absent a decision to terminate the contract.

222.    Defendant breached the Employment Contract when it terminated the contract in retaliation for Plaintiff's good faith statements regarding what he believed in good faith to be illegal City management practices, abuse of authority, gross waste of taxpayer money,

violation of state and federal statutes, rules and regulation, and retaliation against himself for exercising his lawful right to appeal the City's termination decision.

223.    Defendant's conduct was in violation of the implied covenant of good faith and fair dealing.

224.    Defendant's breach was wanton and reckless, and done in bad faith, and with the intent to frustrate the original intent and the Plaintiff's enjoyment of the contract.

225.    Defendant knew that its breach of contract would cause mental suffering.

226.    As a result of Defendant's breach, Plaintiff has suffered damages including lost income, lost future income, loss of reputation, mental suffering and lost benefits.

227.    Plaintiff therefore requests damages equivalent to his lost income, lost future income, and lost benefits, together with interest at the legal rate.

228.    Plaintiff also requests damages for emotional distress he suffered as a direct result of Defendant's wanton and reckless disregard of his rights under the contract.

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

1.    On Plaintiff's First Claim for Relief:

    a.    A declaration that Defendant, under color of law, deprived Plaintiff of Constitutionally protected rights;

    b.    An award of economic damages for past and future lost wages and benefits and out-of-pocket expenses, plus prejudgment interest, in an amount to be determined at trial;

    c.    An award of compensatory damages in the amount of $750,000.00;

    d.    Plaintiff's attorney's fees, expert fees and costs incurred herein.

2.    On Plaintiff's Second Claim for Relief:

    a.    A declaration that Defendants under color of law, deprived Plaintiff of Constitutionally protected rights;

      b.      An award of economic damages for past and future lost wages and benefits and out-of-pocket expenses, plus prejudgment interest, in an amount to be determined at trial;

      c.      An award of compensatory damages in the amount of $750,000.00;

      d.      Plaintiff's attorney's fees, expert fees and costs incurred herein.

3.      On Plaintiff's Third Claim for Relief:

      a.      A declaration that Defendant violated Plaintiff's statutorily-protected right to be free from retaliation for resisting and reporting unlawful actions, mismanagement, gross waste of funds and abuse of authority;

      b.      All appropriate injunctive relief, including reinstatement;

      c.      An award of economic damages for past and future lost wages and benefits and out-of-pocket expenses, plus prejudgment interest, in an amount to be determined at trial;

      d.      An award of compensatory damages in the amount of $750,000.00;

      e.      Plaintiff's attorney's fees, expert fees and costs incurred herein.

4.      On Plaintiff's Fourth Claim for Relief:

      a.      A declaration that Defendant violated Plaintiff's statutorily-protected right to request a civil or administrative hearing;

      b.      All appropriate injunctive relief, including reinstatement;

      c.      An award of economic damages for past and future lost wages and benefits and out-of-pocket expenses, plus prejudgment interest, in an amount to be determined at trial;

      d.      An award of compensatory damages in the amount of $750,000.00;

      e.      Plaintiff's attorney's fees, expert fees and costs incurred herein.

5.      On Plaintiff's Fifth Claim for Relief:

      a.      A declaration that Defendant violated Plaintiff's statutorily-protected

right to report and resist wrongful conduct;

    b.     All appropriate injunctive relief, including reinstatement;

    c.     An award of economic damages for past and future lost wages and benefits and out-of-pocket expenses, plus prejudgment interest, in an amount to be determined at trial;

    d.     An award of compensatory damages in the amount of $750,000.00;

    e.     Plaintiff's attorney's fees, expert fees and costs incurred herein.

6.    On Plaintiff's Sixth Claim for Relief:

    a.     An award of economic damages for past and future lost wages and benefits and out-of-pocket expenses, plus prejudgment interest, in an amount to be determined at trial;

    b.     An award of compensatory damages in the amount of $750,000.00.

7.    On Plaintiff's Seventh Claim for Relief:

    a.     An award of economic damages for past and future lost wages and benefits and out-of-pocket expenses, plus prejudgment interest, in an amount to be determined at trial;

    b.     A refund of all compensation he has paid to the City under the Agreement and forgiveness of any remaining amounts due.

8.    On Plaintiff's Eighth Claim for Relief:

    a.     An award of economic damages for past and future lost wages and benefits and out-of-pocket expenses, plus prejudgment interest, in an amount to be determined at trial;

    b.     An award of compensatory damages in an amount to be determined at trial.

9.    Plaintiff demands a jury trial.

DATED this 7th day of May, 2010.

BUCHANAN ANGELI ALTSCHUL
& SULLIVAN LLP

Andrew Altschul, OSB No. 980302
E-mail: andrew@baaslaw.com
Kristine Lambert, OSB No. 010684
E-mail: kristine@baaslaw.com
Telephone: (503) 974-5015

Of Attorneys for Plaintiff